IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Allied Pilots Association,<br>*Plaintiff*,<br><br>v.<br><br>American Airlines, Inc.,<br>*Defendant*. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF

### INTRODUCTION

1. This is an action for injunctive relief under the Railway Labor Act ("RLA") to preserve the *status quo* pending the exhaustion of the RLA's dispute-resolution procedures applicable to a "major" dispute between Plaintiff Allied Pilots Association ("APA") and Defendant American Airlines, Inc. ("American").

2. During the pendency of collective bargaining toward a new agreement between American and APA—which serves as the collective-bargaining representative for the roughly 14,000 pilots at American—American unilaterally altered the working conditions of certain APA-represented pilots, especially those pilots classified as "Check Airmen."

3. That unilateral change in working conditions cannot be justified under the existing collective-bargaining agreement and thus constitutes a violation of American's obligation to preserve the *status quo* under the RLA's Section 2, Seventh, and Section 6. 45 U.S.C. § 152, Seventh, and § 156.

4. In this action, APA seeks a preliminary and permanent injunction that will restore the *status quo*, thereby ensuring that this "major" dispute is resolved via the carefully calibrated

1

procedures of the RLA rather than economic self help of the sort that American has exercised here.

## PARTIES

5. APA is the certified collective-bargaining agent for approximately 14,000 pilots of American, with its principal place of business located at 14600 Trinity Boulevard, Suite 500, Fort Worth, Texas 76155.

6. American is a Delaware corporation and a U.S.-based air carrier engaged in interstate or foreign commerce within the meaning of the Railway Labor Act. *See, e.g.*, 45 U.S.C. § 181. Its principal place of business is located at 1 Skyview Drive, Fort Worth, Texas 76155.

## JURISDICTION AND VENUE

7. Federal question jurisdiction exists under 28 U.S.C. § 1331 because this lawsuit alleges a violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

8. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) because American is headquartered in this district.

## STATEMENT OF FACTS

9. APA has been certified by the National Mediation Board as the exclusive bargaining representative of most pilots employed by American since 1963.

10. Over the course of their long relationship, APA and American have executed a series of collective-bargaining agreements ("CBAs") that govern virtually all aspects of pilots' employment. APA and American entered into CBAs in 2003, 2013, and again in 2015, following the merger between American and US Airways.

11. In 2018, APA gave written notice pursuant to the parties' CBA and Section 6 of the RLA, 45 U.S.C. § 156, that it intended to engage in bargaining for a new CBA to replace the one that

has governed the parties' relationship since 2015. APA and American actively engaged in bargaining in 2019 and 2020. Although bargaining regarding the terms of a new CBA was temporarily paused in 2020 and early 2021 due to the coronavirus pandemic, the parties resumed bargaining in July 2021. Beginning in January of 2022 and continuing into February of 2022, the parties engaged in intensive negotiations, with negotiators meeting virtually every day in a hotel conference room, ostensibly out of a mutual desire to reach agreement on a new contract.

*Check Airmen and Flight Simulator Evaluation Sessions*

12. As is common in the airline industry, American employs pilots to serve as "Check Airmen." Check Airmen are experienced pilots who are approved by the Federal Aviation Administration ("FAA") to train and evaluate line pilots. A special category of Check Airmen, known as X-Type Check Airmen, are qualified to train and evaluate line pilots during both flight simulator sessions and in-flight sessions. Check Airmen are members of the bargaining unit represented by APA. Section 12 of the parties' CBA governs aspects of Check Airmen's work. Other aspects of Check Airmen's work are governed by the parties' established past practices, which have become implied terms of the parties' CBA.

13. One of those established past practices concerns the staffing of flight simulator training and evaluation sessions. During flight simulator training and evaluation sessions, pilots mimic the experience of piloting a specific type of plane under the supervision of another pilot who serves as an instructor or evaluator. Those flight simulator sessions are often used for the purpose of training pilots to fly new types of aircraft (such as, for example, a Boeing 777) or to occupy new duty positions (such as, for example, a First Officer seeking to become a Captain). At the conclusion of pilots' training, their competence to fly a new type of aircraft or to occupy a

new duty position is evaluated during a flight simulator evaluation session known as a "Line Operational Evaluation" ("LOE").

14. Those LOE sessions seek to confirm that each newly trained pilot has developed the skills necessary to fill a specific duty position on a specific aircraft without jeopardizing the flying public. It is thus essential to evaluate each pilots' skills thoroughly to ensure the safety of the customers who fly on American's planes. To do so, LOE sessions seek to simulate unusually difficult flying conditions. For example, LOE sessions seek to simulate the experience of flying in low-visibility conditions and coping with myriad malfunctions to include engine fires and failures and flight control failures, among other flight emergencies.

15. Those LOE sessions are also crucial to a pilot's career because the result of an unsatisfactory performance becomes part of the pilot's permanent FAA record and will follow that pilot for the duration of his or her professional flying career, whether at American or another employer.

16. To recreate the experience of actually piloting a plane as closely as possible, flight simulator sessions require a complete crew—ordinarily consisting of a Captain and First Officer—occupying their normal duty position, interacting with one another, and otherwise acting just as they would if they were flying an actual airplane. Ordinarily, the participants in a flight simulator session participate with the crew member with whom they usually fly or train. Sometimes, however, scheduling issues or other contingencies interfere with scheduling a complete crew for a flight simulator session. In those circumstances, another pilot serves as a substitute for the absent crew member. That substitute is colloquially known as a "seat filler."

17. Serving as a seat filler is specialized work, particularly in the context of an LOE session. To serve in that role appropriately, a pilot must act as he or she would if flying an actual

airplane. Crew members ordinarily interact closely with one another over the course of a flight, monitoring their counterpart's actions and correcting those actions as needed. When it comes to LOE sessions, however, the seat filler cannot play too active a role in correcting or otherwise instructing the trainee participating in the simulation for the purpose of evaluation. Doing so, would minimize the value of the session for testing the skills of the trainee being evaluated.

18. Historically, a wide range of pilots have served as seat fillers for flight simulator *training* sessions. When it comes to flight simulator *evaluation* sessions, however, American has relied exclusively on Check Airmen to serve as seat fillers for decades. That established past practice is reflected in American's Instructor/Evaluator Administrative Guide, a manual that summarizes American's training practices.

19. That established past practice recognizes both the significance of flight simulator evaluation sessions and the difficulty of serving as a seat filler during such a session. Relying on experienced and specially qualified Check Airmen to serve as seat fillers during flight simulator evaluation sessions maximizes the likelihood that the session will be conducted appropriately, to the benefit of both the flying public, whose safety rests in the hands of skilled pilots, and the pilots, whose careers turn on those evaluations.

*American's Unilateral Change to Check Airmen's Working Conditions*

20. On or about April 5, 2022, American unilaterally abandoned the established past practice of relying exclusively on Check Airmen to serve as seat fillers in LOE sessions. Instead, it began to schedule several recently hired "Fleet Training Pilots" from outside of the bargaining unit to serve in that role throughout the month of April.

21. Those Fleet Training Pilots are not in the bargaining unit represented by APA or, for that matter, by any labor union.

22. On information and belief, the Fleet Training Pilots are former First Officer line pilots who do not have the experience and qualifications of Check Airman, and they are not qualified to serve as seat fillers in many of the LOE sessions for which they have served (or were scheduled to serve) in that role.

23. After learning that American had begun scheduling Fleet Training Pilots to serve as seat fillers in LOE sessions, APA President Eric Ferguson directly communicated with his management counterpart to demand that American return to the *status quo* by relying only on Check Airmen to serve as seat fillers in those sessions. In subsequent discussions, American acknowledged that the company has historically used Check Airmen to serve as seat fillers for flight simulator evaluation sessions. American also communicated that its abandonment of the parties' established past practice of using Check Airmen as seat fillers during those sessions was intentional and that it intended to continue to schedule Fleet Training Pilots as seat fillers in LOE sessions throughout the month of April.

24. After APA objected to the use of Fleet Training Pilots as seat fillers for LOE sessions, American altered its course, and, on April 11, 2022, informed APA that it intended to announce a different and permanent alteration of its seat filling practices effective in May 2022. Specifically, American indicated that it would begin permitting line pilots within the bargaining unit to volunteer to serve as seat fillers for extra pay for LOE sessions during their time off, displacing the Check Airmen who had long performed that work.

25. After learning that American planned to alter the working conditions of Check Airmen permanently, APA informed American that it objected to American's unilateral alteration of the *status quo* regarding the use of Check Airmen and asked for the opportunity to bargain with American over that issue. American rejected that offer to bargain and indicated that it would

implement its new policy for staffing seat fillers for flight simulation evaluation sessions, notwithstanding APA's objection.

26. On April 13, 2022, American announced that formal change in policy and practice regarding LOE seat fillers in a communication sent to its flight team. That same day, American informed APA that it was discontinuing the use of Fleet Training Pilots as seat fillers for LOE sessions.

27. As a result of this unilateral change in training practice, American has not only altered the *status quo* with regard to the working conditions of the Check Airmen, but it has also unilaterally created entirely new working conditions for those pilots who it now seeks to have "volunteer" to take over this Check Airmen work and refused to negotiate over those new conditions.

28. The Company's unilateral change to the *status quo* regarding the use of seat fillers in flight simulator evaluation sessions is just one instance in a pattern of unilateral conduct that has either been announced or implemented by the Company in recent months. Those unilateral actions include such things as changes to the manner in which pilots are scheduled for annual recurrent training, the scheduling of a newly required, additional day of in-person ground school related to "Crew Resource Management" without proper regard to the existing CBA, and arbitrarily imposing new conditions for eligibility to use pilot schedule modification tools.

29. This pattern now appears to be part of an intentional strategy to undermine and distract APA while the parties are at the table attempting to negotiate a new CBA.

## COUNT I

**(Breach of *Status Quo* Obligations Under 45 U.S.C. § 152, Seventh and § 156)**

30. APA realleges and incorporates by reference the paragraphs set forth above.

31. The RLA's Section 2, Seventh, 45 U.S.C. § 152, Seventh, prohibits carriers such as American from changing the rates of pay, rules, or working conditions of its employees except in the manner prescribed by Section 6 of that statute, 45 U.S.C. § 156.

32. Section 6, 45 U.S.C. § 156, in turn, sets out a process for the negotiation of CBAs under the RLA, which begins with a carrier or collective-bargaining representative giving written notice that it intends to initiate bargaining over intended changes to a CBA. Section 6 further provides that, once such written notice has been given, "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has finally been acted upon" via a carefully calibrated dispute-resolution process established by the statute.

33. These provisions have been interpreted to prohibit a carrier from unilaterally changing employees' working conditions that are embodied in a CBA, or that are implied into a CBA through past practice, unless the changes are arguably justified by an interpretation of the CBA. *See BNSF Ry. Co. v. Int'l Assoc. of Sheet Metal, Air, Rail & Transp. Workers- Transp. Div.*, 973 F.3d 326, 335 (5th Cir. 2020) (citing *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 307 (1989) ("*Conrail*")). If the changes to working conditions are not arguably justified by an interpretation of a CBA, the dispute is characterized as a "major" dispute. *Conrail*, 491 U.S. at 307.

34. When faced with a major dispute, federal courts have jurisdiction to issue an injunction to reinstate the *status quo*—that is, the working conditions that existed before the unlawful change to working conditions was made—pending the exhaustion of the dispute-resolution procedures of the RLA. *BNSF Ry.*, 973 F.3d at 337, 339.

35. American's abandonment of the parties' established past practice of using Check Airmen as seat fillers for flight simulator evaluation sessions is a change to the working conditions of Check Airmen that is not arguably justified by any interpretation of the parties' CBAs.

36. The parties' CBA does not contain a management rights provision, or any other provision, that even arguably permits American to change pilots' working conditions without negotiating those changes with APA.

37. Further, American unilaterally altered the working conditions of Check Airmen and prospective "volunteer" line pilots while the parties are engaged in the Section 6 bargaining process, in violation of the prohibition of altering the *status quo* while Section 6 negotiations are ongoing.

38. APA has made all reasonable efforts to settle this dispute through negotiation. An injunction is necessary to permit the parties to pursue the carefully calibrated process for the resolution of major disputes codified by the RLA if American wishes to alter the working conditions of Check Airmen.

39. The changes that American have made to Check Airmen's working conditions constitute a major dispute and are due to be enjoined.

WHEREFORE, APA requests the following relief:

A. A preliminary and permanent injunction requiring American to reinstate the working conditions of Check Airmen that existed before it unlawfully changed those working conditions by ordering that American rely exclusively on Check Airmen as seat fillers in all LOE sessions unless and until American exhausts the dispute-resolution procedures established by the RLA for "major" disputes;

B. A judgment requiring American to make all affected employees whole; and

C. Any such further relief as the interests of justice may require.

Date: April 14, 2022

/s/ Sanford R. Denison
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

Joshua B. Shiffrin*
D.C. Bar No. 501008
Joshua A. Segal*
D.C. Bar No. 1033731
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St, N.W., Suite 1000
Washington, D.C. 20005
Tel.: (202) 842-2600
Fax.: (202) 842-1888
Email: jshiffrin@bredhoff.com
Email: jsegal@bredhoff.com

*Counsel for Plaintiff Allied Pilots Association*

*Pro Hac Vice *Motion to be Filed*

## **VERIFICATION**

I, Captain Eric Ferguson, pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the President of the Allied Pilots Association ("APA").

2. I have reviewed the Complaint in this matter.

3. The allegations in the Complaint are based on the personal knowledge of me and of other members and representatives of APA.

4. I hereby affirm that all of the allegations in this Complaint are true and correct to the best of my knowledge, information, and belief on the basis of either my personal knowledge or my conversations with other members or representatives of APA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2022, in Fort Worth, Texas.

_____
Captain Eric Ferguson