# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

Allied Pilots Association,
        *Plaintiff*,

   v.

American Airlines, Inc.,
        *Defendant*.

Civil Action No. 4:22-cv-00315-O

**PLAINTIFF ALLIED PILOTS ASSOCIATION'S BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANT AMERICAN AIRLINES, INC.'S MOTION TO DISMISS**

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

Joshua B. Shiffrin*
D.C. Bar No. 501008
Joshua A. Segal*
D.C. Bar No. 1033731
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St, N.W., Suite 1000
Washington, D.C. 20005
Tel.: (202) 842-2600
Fax.: (202) 842-1888
Email: jshiffrin@bredhoff.com
Email: jsegal@bredhoff.com

*Counsel for Plaintiff Allied Pilots Association*

* *Admitted* Pro Hac Vice

Dated: April 25, 2022

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ........................................................................................................................ 7

   I.   APA is likely to succeed on the merits of its claim.............................................. 9

     A.   Under the RLA, federal courts must enjoin the unilateral implementation of new working conditions that cannot be arguably justified by the parties' CBA. .................... 9

     B.   American seeks to change unilaterally the working conditions of Check Airmen without any arguable contractual justification. ............................................. 11

   II.   Issuance of an injunction does not turn on irreparable harm. ............................. 21

   III.  The balance of equities favors an injunction to maintain the *status quo*. .......................... 22

   IV.  The public interest favors an injunction. .......................................................... 23

   V.   APA has made all reasonable efforts to resolve its dispute with American...................... 23

   VI.  This Court should require APA to post little to no security.............................. 24

CONCLUSION..................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Application of the Allied Pilots Ass'n,*
  19 NMB 113 (1991) .................................................................................2, 21

*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,*
  289 F.3d 373 (5th Cir. 2002) ...................................................................20

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.,*
  879 F.3d 754 (7th Cir. 2017) ...............................................................17, 18

*Bhd. of Locomotive Eng'rs v. Burlington N. R.R. Co.,*
  838 F.2d 1102 (9th Cir. 1988) .............................................................17, 18

*Bhd. of Maint. of Way Emps. v. Chi. & N. W. Transp. Co.,*
  827 F.2d 330 (8th Cir. 1987) ..........................................................13, 15, 18

*Bhd. Ry. Carmen v. Mo. Pac. R.R. Co.,*
  944 F.2d 1422 (8th Cir. 1991) ..................................................................14

*BNSF Ry. Co. v. Int'l Assoc. of Sheet Metal, Air, Rail & Transp. Workers -
Transp. Div.,*
  973 F.3d 326 (5th Cir. 2020) .................................................9, 10, 21, 24

*Bonnell/Tredegar Indus., Inc. v. NLRB,*
  46 F.3d 339 (4th Cir. 1994) ...............................................................13, 18

*Burlington N. R.R. v. Bhd. of Maint. of Way Emps.,*
  481 U.S. 429 (1987) ................................................................................24

*Consol. Rail Corp. v. Ry. Lab. Execs. Ass'n,*
  491 U.S. 299 (1989) ....................................................................... *passim*

*Detroit & Toledo Shore Line Ry. Co. v. United Transp. Union,*
  396 U.S. 142 (1969) .......................................................................11, 12, 23

*Elgin, J. & E. Ry. v. Burley,*
  325 U.S. 711 (1945) .................................................................................10

*Flight Options, LLC v. Int'l Bhd. of Teamsters,*
  863 F.3d 529 (6th Cir. 2017) .............................................................22, 23

*Hawaiian Airlines, Inc. v. Norris,*
  512 U.S. 246 (1994) ..................................................................................9

*Int'l Bhd. of Teamsters v. Chautauqua Airlines,*
  186 F. Supp. 2d 901 (S.D. Ind. 2001) ............................................................16, 21

*Int'l Bhd. of Teamsters v. Sw. Airlines,*
  875 F.2d 1129 (5th Cir. 1989) ........................................................................18

*Janvey v. Alguire,*
  2010 WL 11619267 (N.D. Tex. June 10, 2010) ................................................25

*Ne. Ill. Reg'l Commuter Rail Corp. v. Int'l Ass'n of Sheet Metal, Air, Rail, &*
  *Transp. Workers,*
  2022 WL 60523 (N.D. Ill. Jan. 6, 2022) ..........................................................15

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n,*
  491 U.S. 490 (1989)..........................................................................................12

*Ry. Express Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks,*
  437 F.2d 388 (5th Cir. 1971) ............................................................................2

*Ry. Labor Execs Ass'n v. Norfolk & W. Ry. Co.,*
  833 F.2d 700 (7th Cir. 1987) ..........................................................................13

*S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen,*
  337 F.2d 127 (D.C. Cir. 1964) ........................................................................21

*Small v. Avanti Health Sys., LLC,*
  661 F.3d 1180 (9th Cir. 2011) ........................................................................23

*Steward v. West,*
  449 F.2d 324 (5th Cir. 1971) ..........................................................................25

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................................7

## Statutes and Regulations

29 U.S.C. § 107........................................................................................................2, 24

29 U.S.C. § 108........................................................................................................8, 24

45 U.S.C. § 152.................................................................................................10, 11, 16

45 U.S.C. § 156............................................................................................................10

45 U.S.C. § 184............................................................................................................10

49 U.S.C. § 44703(i)(2)(A)(ii)......................................................................................4

14 C.F.R. §§ 121.901, 121.909....................................................................................13

**Other Authorities**

Federal Rule of Civil Procedure 65(c) ........................................................................24

Restatement (Second) of Contracts § 203(a) ............................................................20

11A Wright & Miller, *Fed. Prac. & Proc.* § 2954 (3d ed.)........................................25

Plaintiff Allied Pilots Association ("APA") submits this combined brief both in support of its motion for a preliminary injunction and in opposition to Defendant American Airlines, Inc.'s ("American") motion to dismiss. Dkt. 9 (hereinafter, "MTD").

## INTRODUCTION

In this action, APA seeks injunctive relief under the Railway Labor Act ("RLA" or "the Act"), 45 U.S.C. §§ 151-88, to prevent American from unilaterally altering its pilots' working conditions without first negotiating with APA or otherwise pursuing the RLA's carefully calibrated dispute-resolution provisions applicable to "major" disputes, like this one. By unilaterally imposing a new policy for staffing substitute pilots in flight simulator evaluation sessions, American has taken work from Check Airmen—a specialized category of pilots represented by APA in collective bargaining—that they have performed for decades under the parties' collective-bargaining agreement ("CBA") and unilaterally created new terms and conditions of employment for those pilots is now seeks to perform the Check Airmen work. Still worse, American has done so even as the parties are engaged in ongoing negotiations over the Check Airmen's working conditions

Make no mistake, American is in desperate straits regarding its failure to properly plan for the increased training needs associated with the recovery from the pandemic. If American needs to expand its training capacity by altering the working conditions of Check Airmen, then the RLA requires it to negotiate those changes with APA, not impose them via fiat. Because American's unilateral act of economic self-help cannot even arguably be justified by the parties' existing CBA, it must be enjoined unless and until American exhausts the RLA procedures applicable to "major" disputes.

In American's motion to dismiss, it characterizes the parties' dispute over staffing substitute pilots in flight simulator evaluation sessions as a "minor" dispute under the RLA,

1

subject to the exclusive jurisdiction of the System Board of Adjustment.  It has launched a factual attack on this Court's jurisdiction, claiming that the parties' CBA authorizes it to take work from Check Airmen that American acknowledges they have long performed.

This case thus turns on the narrow question of whether the parties' dispute qualifies as a "minor" dispute or a "major" dispute under the RLA.  As we show below, American's obviously insubstantial contractual justification for its unilateral conduct makes this a "major" dispute. This Court thus has jurisdiction to enjoin American's unilateral conduct until it has exhausted the RLA's major dispute resolution procedures.  American's motion to dismiss should thus be denied and APA's motion for a preliminary injunction granted.[1]

## BACKGROUND

**I.**  Since 1963, APA has been certified by the National Mediation Board ("NMB") as the exclusive bargaining representative for the pilots employed by American.  APA App. 002 (Ferguson Decl. ⁋ 5).  In the subsequent decades, APA and American have executed a series of CBAs governing nearly all aspects of pilots' employment with American.  *Id.* at 002 (Ferguson Decl. ¶ 6).  Their 2015 CBA remains in effect today.  *Id.* (Ferguson Decl. ¶ 6).

**II.**  American employs a particular classification of pilots known as "Check Airmen." *See, e.g.*, *id.* at 099 (Scully Decl. ¶ 4).  In 1991, the NMB recognized those Check Airmen as members of the bargaining unit represented by the APA, *In re Application of the Allied Pilots Ass'n*, 19 NMB 113, 127 (1991), and much of their work is currently governed by Section 12(B) of the parties' 2015 CBA, APA App. 099 (Scully Decl. ¶ 4); *see also id.* at 055-64 (Ferguson

---

[1]     In light of the requirements of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 107, APA asks that this Court schedule an evidentiary hearing before issuing an injunction, unless the parties can reach a stipulation to proceed without one, *Ry. Express Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks*, 437 F.2d 388, 395 (5th Cir. 1971).

Decl. Ex. 1 at § 12(B) (hereinafter, "CBA")).  Check Airmen tend to be experienced pilots who are approved by the Federal Aviation Administration ("FAA") to train and evaluate line pilots. *Id.* at 100 (Scully Decl. ¶ 5).  Check Airmen ordinarily receive months of training to prepare them to serve in that role.  *Id.* at 100 (Scully Decl. ¶ 7).  Among other provisions, the 2015 CBA recognizes a particular classification of Check Airmen known as "X-Type Check Airmen," who perform certain functions utilizing a flight simulator.  *Id.* at 056 (CBA § 12(B)(1)(m)).

Flight simulators mimic the experience of piloting a specific type of aircraft.  *Id.* at 100 (Scully Decl. ¶ 9).  American, like most airlines, employs simulators that replicate the aircraft in its fleet as closely as possible, and it relies on flight simulator sessions to train and evaluate its pilots.  *Id.* at 100-101 (Scully Decl. ¶¶ 9-13).  Among other functions, those flight simulator sessions are used to train pilots to fly new types of aircraft (such as, for example, a Boeing 777) or to occupy new duty positions (such as, for example, a Boeing 777 First Officer seeking to become a Boeing 777 Captain).  *Id.* at 101 (Scully Decl. ¶¶ 10-11).  After pilots have completed that training, their new skills are tested during a flight simulator evaluation session known as a "Line Operational Evaluation"—or "LOE," for short.  *Id.* at 101 (Scully Decl. ¶ 12).

LOE sessions are essential both to aviation safety and to each pilot's professional advancement.  As to safety, LOE sessions seek to confirm that each newly trained pilot has developed the skills necessary to fill a specific duty position on a specific aircraft without jeopardizing the flying public.  *Id.* at 102 (Scully Decl. ¶ 15).  It is thus essential to evaluate each pilot's skills thoroughly to ensure the safety of the customers who fly on American's planes.  To do so, LOE sessions seek to simulate unusually difficult flying conditions.  *Id.*  For example, LOE sessions often seek to simulate the experience of flying in low-visibility conditions or coping with malfunctions, such as engine failures or fires or flight-control malfunctions.  *Id.*

3

As to professional advancement, the results of those LOE sessions determine, in the short term, whether a pilot is qualified to fly a specific aircraft or to be promoted from First Officer to Captain.  *Id.* at 102 (Scully Decl. ¶ 16).  If a pilot performs unsatisfactorily during an LOE session, that result must be reported to the Pilot Records Database maintained by the FAA, with potential adverse consequences later in a pilot's career.  *See* 49 U.S.C. § 44703(i)(2)(A)(ii).

To recreate the experience of flying a plane as closely as possible, flight simulator sessions usually require a complete crew—consisting of a Captain and First Officer—occupying their duty positions, interacting with one another, and otherwise acting as they would if they were flying an actual airplane.  APA App. 102 (Scully Decl. ¶ 17.)  To the maximum extent possible, the participants in a flight simulator session participate alongside the crew member with whom they have been paired for training.  *Id.*  Sometimes, however, scheduling issues or other contingencies interfere with scheduling those training pairs to form a complete crew for a flight simulator session.  *Id.*  In those circumstances, another pilot serves as a substitute for the absent crew member.  *Id.*  That substitute is colloquially known as a "seat filler."  *Id.*

Serving as a seat filler is specialized work.  To serve in that role appropriately, a pilot must act as he or she would if flying an actual airplane.  *Id.* at 103 (Scully Decl. ¶ 18).  Crew members ordinarily interact closely with one another over the course of a flight, including communicating about the status of the aircraft and flying conditions, monitoring their counterpart's actions, and correcting those actions as needed.  *Id.*  When it comes to LOE sessions, however, the seat filler cannot play too active a role in correcting or otherwise instructing the trainee participating in the simulation for the purpose of evaluation.  *Id.*  Doing so would minimize the value of the session for testing the skills of the trainee being evaluated.  *Id.*  Seat fillers thus must balance giving trainees too little assistance, which would be both

4

unrealistic and unfair, and too much assistance, such that the trainees' skills cannot be evaluated. Check Airmen learn to strike an appropriate balance via experience instructing and evaluating pilots in flight simulators. *Id.*

Historically, a wide range of pilots have served as seat fillers for flight simulator *training* sessions. When it comes to flight simulator *evaluation* sessions, however, American has a decades-long practice of only scheduling Check Airmen to serve as LOE seat fillers. *Id.* at 103 (Scully Decl. ¶ 19); *id.* at 118 (Darrah Decl. ¶ 9); *id.* at 121 (Holehouse Decl. ¶ 9); *id.* at 123 (Wilkshire Decl. ¶ 8). That practice dates back at least a quarter century, if not longer. *Id.* at 119, 121 (Holehouse Decl. ¶¶ 3, 9). American does not dispute this fact in its papers, and the practice is reflected in American's Instructor/Evaluator Administrative Guide ("IEAG"), a manual that summarizes American's training practices. Among other contents, that Guide identifies the employee classifications permitted to serve as seat fillers in various flight simulator sessions. *Id.* at 103-104 (Scully Decl. ¶¶ 20-21); *id.* at 110-15 (Scully Decl. Ex. 1 ("Guide") at 11-4 to 11-9). Although a wide range of pilots may serve as seat fillers for most flight simulator training sessions, the IEAG indicates that *only* Check Airmen are permitted to do so during LOE sessions. *Id.* Line pilots have never served as seat fillers during LOE sessions at American.

**III.** In 2018, APA gave notice to American pursuant to the 2015 CBA and the RLA's Section 6 that it sought to alter the terms of that CBA. *Id.* at 002 (Ferguson Decl. ¶ 8). The parties began bargaining in 2019, only to be interrupted in 2020 by the coronavirus pandemic, when the parties' bargaining focus shifted to addressing issues related to that emergency. *Id.* After the focus of bargaining shifted back to a new CBA in July 2021, the parties agreed to pursue a "targeted" approach in which they would seek to reach a shorter-term agreement that only looked to modify a relatively small number of sections of the CBA. *Id.* at 003 (Ferguson

5

Decl. ¶ 9).  Section 12(B)—which, as noted, covers some of the working conditions applicable to Check Airmen—has become one of the few sections about which the parties are presently engaged in negotiations.  *Id.* at 003 (Ferguson Decl. ¶ 11).  That bargaining is very active.  In January and February, the parties held "super negotiations," in which they met on a nearly daily basis in an attempt to reach a tentative agreement.  *Id.* at 003 (Ferguson Decl. ¶ 10).

**IV.**  In April 2022, as the industry continued to recover from the effects of the pandemic, American's recently hired Vice President of Flight Operations Training announced that "we need to expand our pilot-training capabilities to a *historically unprecedented level*."  Am. App. 230 (Jewett Decl. Ex. T) (emphasis added).  Cognizant of the strains facing American, APA has proposed improving the compensation and working conditions of Check Airmen to enhance recruitment and retention of those pilots as part of a larger package of contractual changes. APA App. 003 (Ferguson Decl. ¶ 11).  But rather than achieve its goals through ongoing negotiations with APA, American seeks to expand its training capabilities by unilaterally abandoning the parties' established past practice of exclusively scheduling Check Airmen as LOE seat fillers.

First, beginning in the first week of April, APA learned that American had scheduled several recently hired "Fleet Training Pilots"—non-Check Airmen management pilots who are not currently recognized as belonging to the APA bargaining unit—to serve as seat fillers in many LOE sessions in April.  *Id.* at 004 (Ferguson Decl. ¶ 15); *id.* at 104-05 (Scully Decl. ¶ 22); Am. App. 19 (Hogg Decl. ¶ 29).  APA immediately objected to that practice.  Its President, Captain Eric Ferguson, communicated directly with his management counterpart by phone and text message to ask American to return to the *status quo* and exclusively schedule Check Airmen to serve as seat fillers for LOE sessions.  APA App. 004-5 (Ferguson Decl. ¶¶ 16-19).

Shortly thereafter, on April 11, 2022, American informed APA that, beginning in May, it

6

would begin soliciting line pilots within the bargaining unit, but not Check Airmen, to "volunteer" to serve as seat fillers for LOE sessions.  *Id.* at 006-7 (Ferguson Decl. ¶¶ 22-23); *see also* Am App. 20 (Hogg Decl. ¶ 33).  After learning of American's efforts to change the parties' seat-filling practices, APA representatives met with American representatives.  APA App. at 006 (Ferguson Decl. ¶ 23).  In that meeting, APA objected to this new alteration of the *status quo*— which now included the unilateral creation of new working conditions for the "volunteer" pilots—and asked to bargain with American over the issues.  *Id.*  American refused to do so, indicating that it would implement its new policy, notwithstanding APA's objections.  *Id.*

 American subsequently announced its new policy on April 13, 2022, without negotiating the change or the terms of the policy with APA.  *Id.* at 007, 094 (Ferguson Decl. ¶ 24 & Ex. 6).  Volunteer line pilots, American explained, would be afforded the opportunity to perform LOE "seat filler" work and trained, scheduled, and compensated for that work in a manner determined unilaterally by American and not provided for anywhere in the collective bargaining agreement.[2]  *Id.*  American's announcement indicated that all volunteers would receive a day of training and 5 hours and 25 minutes of pay for serving as LOE seat fillers.  *Id.* at 096 (Ferguson Decl. Ex. 6).

## ARGUMENT

Ordinarily, to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But where, as here, a

---

[2]     Although American has sometimes offered pilots opportunities to perform "special assignments" without negotiating with APA, those assignments were previously restricted to assisting American with managerial or administrative work and have never before been used to assign pilots to perform work that had historically been performed by bargaining unit members. APA App. 007 (Ferguson Decl. ¶ 25).

party seeks to enforce the RLA's command to maintain the *status quo* pending the resolution of a "major" dispute over an employer's efforts to transform the working conditions of its employees, courts modify those ordinarily applicable factors to accommodate the mandates of the RLA and the NLGA.  First, a party seeking an injunction to enforce the RLA's *status quo* obligations during the pendency of a major dispute need not make "the customary showing of irreparable injury."  *Consol. Rail Corp. v. Ry. Lab. Execs. Ass'n*, 491 U.S. 299, 303 (1989) (hereinafter, "*Conrail*").  Second, under the NLGA's "clean hands" provision, a plaintiff may not obtain injunctive relief if it "has failed to comply with any obligation imposed by law" or "has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."  29 U.S.C. § 108.

Here, APA is entitled to a preliminary injunction that will maintain pilots' *status quo* working conditions unless and until American exhausts the major dispute resolution procedures codified in the RLA.  On the merits, American has no arguable contractual basis, under the parties' CBA, to deprive Check Airmen of the LOE seat-filling work they have performed for decades or to create a new special assignment for "volunteer" line pilots to perform those duties. To the contrary, the practice of relying on Check Airmen for LOE seat filling is so entrenched that it has ripened into an implied contractual obligation.  American's unjustified disregard of that obligation thus give rise to a "major" dispute over altering the terms of the parties' agreement.  And this Court has "subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures" for major disputes under the RLA.  *Conrail*, 491 U.S. at 303.  American's motion to dismiss should thus be denied.

Beyond the merits, the balance of equities and the public interest both tip decisively toward enforcing the RLA's major dispute resolution provisions.  Indeed, APA and American

are already involved in intensive negotiations in which the working conditions of Check Airmen are on the table.  We thus ask this Court to enjoin American's efforts to undermine those negotiations by unilaterally altering Check Airmen's working conditions.

I.      **APA is likely to succeed on the merits of its claim.**

American and APA disagree about very little in this case.  American acknowledges that it "has in the past generally used a Check Pilot as the seat-filler" in LOE sessions.  Am. App. 15 (Hogg Decl. ¶ 21); *see also* MTD 9.  It acknowledges that it now seeks to abandon that longstanding practice by creating an entirely new special assignment for line pilots.  Am. App. 20 (Hogg Decl. ¶ 33); MTD 11.  And it acknowledges that this Court's jurisdiction to enforce the *status quo* obligations of the RLA turns on whether American's unilateral conduct is arguably justified by the parties' CBA.  MTD 16.

As we show below, American's efforts to justify its conduct under the CBA all fail.  American's lead argument—that work within flight simulators "is not within the scope of work covered by the JCBA," MTD 2 (emphasis removed)—is rebutted not only by the plain language of the contract, but also by the parties' longstanding past practice of relying on Check Airmen to serve as seat fillers for LOE sessions, which has ripened into an implied term of the CBA.

A.      Under the RLA, federal courts must enjoin the unilateral implementation of new working conditions that cannot be arguably justified by the parties' CBA.

The RLA seeks "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  To that end, the statute "sets out a mandatory and 'virtually endless' process of 'negotiation, mediation, voluntary arbitration, and conciliation.'"  *BNSF Ry. Co. v. Int'l Assoc. of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div.*, 973 F.3d 326, 334 (5th Cir. 2020) (quoting *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444

(1987)).  The details of those procedures, however, vary "depending upon whether the dispute is 'major' or 'minor'" within the meaning of the RLA.  *Id.*

"Minor" disputes "contemplate the existence of a collective agreement already concluded and relate either to the meaning or proper application of a particular provision."  *BNSF*, 973 F.3d at 335 (cleaned up).  The RLA requires the parties first to "confer" over such a minor dispute. 45 U.S.C. § 152, Sixth.  If those conferences fail to resolve that dispute, it "is subject to compulsory and binding arbitration . . . before an adjustment board established by the employer and the unions representing the employees," which "has exclusive jurisdiction" over the matter. *Conrail*, 491 U.S. at 303; *see also id.* at 304 n.4; 45 U.S.C. § 184.  While the dispute is pending, "a party is permitted to move unilaterally on its 'own interpretation of the agreement pending exhaustion of arbitration,'" without maintaining the *status quo*.  *BNSF*, 973 F.3d at 335 (quoting *Int'l Bhd. of Teamsters v. Sw. Airlines*, 875 F.2d 1129, 1133 (5th Cir. 1989) (en banc)).

"Major" disputes, by contrast, arise "where a party seeks new agreement terms 'affecting rates of pay, rules, or working conditions.'"  *Id.* (quoting 45 U.S.C. § 152, Seventh; § 156). Where a union or employer seeks such a modification, Section 6 of the RLA requires it to serve a notice of its proposed changes to those working conditions.  45 U.S.C. § 156.  During the extended period of negotiation, mediation, and arbitration that follows,[3] "the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions."  *Conrail*, 491 U.S. at 302-03; 45 U.S.C. § 152,

---

[3]     Following service of that notice, the parties must begin "conferences."  45 U.S.C. § 156. If the parties fail to reach agreement through those negotiations, then their disagreements over the terms of a modified agreement "go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration; and finally to possible presidential intervention to secure adjustment."  *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 725 (1945) (internal citations omitted).

Seventh. And federal courts have jurisdiction to enjoin violations of that obligation. *Conrail*, 491 U.S. at 303.

The obligation on both management and labor to maintain the *status quo* during the pendency of major disputes "is central to [the RLA's] design." *Detroit & Toledo Shore Line Ry. Co. v. United Transp. Union*, 396 U.S. 142, 150 (1969) (hereinafter, "*Shore Line*"). It facilitates "an atmosphere in which rational bargaining can occur" and encourages the party seeking a new agreement to compromise "and thus reach agreement without interruption to commerce." *Id.*

Given the central importance of the RLA's *status quo* requirements, a party cannot evade those requirements by disguising its attempt to alter fundamental working conditions as an interpretation of an existing agreement that is subject to the more permissive procedures applicable to mere minor disputes. As the Supreme Court explained in *Conrail*, courts must look through an employer's "insincere" invocation of an alleged contractual right to alter fundamental working conditions. 491 U.S. at 306. Any other rule would risk "undercut[ting] the prohibitions . . . of the Act against unilateral imposition of new contractual terms." *Id.* (internal quotation marks omitted). Only if the contested "action is arguably justified by the terms of the parties' collective-bargaining agreement" is it a "minor" dispute not subject to the RLA's *status quo* obligations. *Id.* at 307. "Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major" and those *status quo* obligations apply with full force. *Id.*

   B.   <u>American seeks to change unilaterally the working conditions of Check Airmen without any arguable contractual justification.</u>

   **1.** There can be no doubt that the work assignments of employees qualify as a "working condition" that, under the RLA's Section 2, Seventh, may only be modified in a manner permitted by the parties' CBA or via the process established by Section 6. 45 U.S.C. § 152, Seventh, § 156; *Shore Line*, 396 U.S. at 144-45. Nor is there any dispute that, for decades, only

11

Check Airmen—not line pilots—have been scheduled to serve as LOE seat fillers.  *Supra* at 5, 9.

There is good reason for that long-established practice:  Check Airmen are highly experienced pilots approved by the FAA to specialize in training and evaluating their fellow pilots.  *Supra* at 3.  Relying on Check Airmen as LOE seat fillers thus ensures that LOE sessions are conducted appropriately, to the benefit of the flying public, who rely on competent pilots to ensure their safety, and American's pilots, whose careers could turn on those evaluations.  Although American's lawyers attempt to denigrate seat filling as "only filling a seat," MTD 1, its Vice President of Flight Operations Training recognizes that a seat filler performs skilled work, "functioning as the Captain or First Officer . . . who supports the student pilot during the training session just as the pilot would provide support to the operating pilot during flight."  Am. App. 11 (Hogg Decl. ¶ 13).  Thus, a seat filler is no more "only filling a seat," than is a pilot flying a scheduled commercial flight.

The parties' longstanding and undisputed past practice of relying on Check Airmen as LOE seat fillers is so deeply entrenched that it has become an implied term in the parties' CBA.  It is blackletter law that "collective-bargaining agreements may include implied as well as express terms" that federal courts must consider when classifying a dispute as "major" or "minor."  *Conrail*, 491 U.S. at 311.  And "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their" agreement's implied terms.  *Id.* (quoting *Transp.-Commc'n Emps. Union v. Union Pac. Ry. Co.*, 385 U.S. 157, 161 (1966)).

Where workplace custom "ha[s] been the unquestioned practice for many years," the Supreme Court has "considered it reasonable for employees to deem it sufficiently established that it would not be changed without bargaining and compliance with the status quo provision of the RLA."  *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 506 (1989)

12

(explaining the Court's holding in *Shore Line*).  That principle recognizes that,

> as a practical matter, it is impossible for the written collective bargaining agreement
> to describe every possible permutation of working conditions that might arise, [such
> that] it is not unusual for the parties to a labor agreement to develop working
> relationships, customs, and practices which are understood to be the norm, but
> which are nowhere reduced to a formal contract term. When longstanding practice
> ripens into an established and recognized custom between the parties, it ought to be
> protected against sudden and unilateral change as though it were a part of the
> collective bargaining agreement itself.

*Bhd. of Maint. of Way Emps. v. Chi. & N. W. Transp. Co.*, 827 F.2d 330, 334 (8th Cir. 1987)

(internal quotation marks omitted).  That is precisely what has happened here.  Indeed, the

practice of relying on Check Airmen, not line pilots, to serve as LOE seat fillers has been in

place not merely for many years, but for at least a quarter century.  *Supra* at 5.  That

longstanding practice is more than enough to create an implied contractual obligation.  *See Ry.*

*Labor Execs Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987) (implying term

into CBA on the basis of a past practice that had been in place "for at least the past twenty years"

without objection); *Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 344 (4th Cir. 1994)

(same, for 18-year past practice).  American itself has implemented that practice, having

complied with it every time it scheduled a Check Airman as an LOE seat filler.

American quibbles that language from the IEAG somehow undermines the parties'

undisputed past practice because, in American's words, they "confirm that American is not

required to use Check Airmen during LOE."  MTD 23.  But that reading of American's training

materials is woefully incomplete.  Indeed, American relies exclusively on the first three pages of

the IEAG's Section 11.3, which establish the minimum skill qualifications for a seat filler,[4] but

---

[4]       Those first three pages of the IEAG excerpt repeat verbatim the text of American's
Advanced Qualification Program ("AQP"), *compare* Am. App. 34 (Hogg Decl. Ex. C), *with* Am.
App. 40-42 (Hogg Decl. Ex. E), which the FAA must approve, *see generally* 14 C.F.R. §§
121.901, 121.909.  They thus set out minimum legal requirements.  But the parties may agree,

13

omits the subsequent pages, which American fails even to include in the appendix supporting its motion. *See* Am. App. 40-42 (Hogg Decl. Ex. E). And those subsequent pages contain tables establishing the pilot classifications that may serve as seat fillers in various flight simulator sessions, providing that only Check Airmen may do so for LOE sessions. *Supra* at 5. Read in its entirety, then, the IEAG plainly establishes that *only* Check Airmen may serve as LOE seat fillers, so long as they also possess the requisite skills—by being line qualified, for example, to fill the role they are assigned in the LOE session. Indeed, that is precisely how American has long implemented its IEAG. If "the use of a Check Pilot as the seat-filler" for LOE sessions were "the least preferred approach," as American now incorrectly insists, MTD 9, then it has been prioritizing that supposedly disfavored option for decades.[5]

American next claims that its use of seat fillers who are not Check Airmen in flight simulator *training* sessions justifies use of non-Check Airmen as seat fillers for LOE sessions, when pilots are being evaluated, not trained. For support, it relies on an out-of-circuit case concluding that an employer's past practice of unliterally implementing health and safety

---

expressly or impliedly, to exceed those minimum requirements, just as they have agreed to pay pilots more than the minimum wage.

[5]     Even if its training documents said what American claims, they would not make the parties' past practice any less of an implied term of their CBA. That is because American does not—indeed, cannot—claim that it has ever *implemented* its newfound interpretation of its training documents until now and, as American candidly acknowledges, it drafts its training documents unilaterally. Am. App. 7-8 (Hogg Decl. ¶¶ 2, 4-5). APA has thus never had an opportunity or need to object to American's claim that line pilots, rather than Check Airmen, may serve as seat fillers, let alone acquiesced to such an abandonment of the parties' past practice. *See Bhd. Ry. Carmen v. Mo. Pac. R.R. Co.*, 944 F.2d 1422, 1429 (8th Cir. 1991) ("The practice must be with the knowledge and acquiescence of employees.").

American's Vice President of Flight Operations Training also misreads outdated FAA guidance from 1990 as prohibiting reliance on Check Airmen as seat fillers. Am. App. 11 (Hogg Decl. ¶ 22). Check Airmen are "line qualified" pilots within the definition of that guidance and are thus not excluded from serving as seat fillers. Am. App. 56 (Hogg Decl. Ex. G). Rather, in context, the guidance simply states that instructors who are either not line qualified or are evaluating the simulator session cannot serve as seat fillers. *Id.* at 70.

standards (such as blood tests, stool samples, and medication restrictions) arguably justified unilateral implementation of a Covid vaccine mandate. *Ne. Ill. Reg'l Commuter Rail Corp. v. Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers*, 2022 WL 60523, at *5 (N.D. Ill. Jan. 6, 2022). Along the way, the court rejected as "inappropriately granular" a union's argument that the employer had never before implemented a health and safety requirement that carried such a high "physical risk of an adverse reaction" or "economic risk of negligent administration of the vaccine without any ability to recover compensation." *Id.* at *6. Where there are "differences of degree, not of kind," between the parties' past practice and contested unilateral conduct, the court explained, that conduct was arguably justified by the CBA. *Id.*

Here, however, the distinction between training and evaluation is a difference of kind, not degree. Unlike trainings sessions, evaluations implicate fairness to trainees, whose careers turn on the results, to say nothing of the safety of the flying public, who put their lives in the hands of American's pilots. By permitting only Check Airmen to serve as LOE seat fillers, the parties have long recognized the fundamental difference between LOE sessions and mere training.

American's efforts to abandon the longstanding past practice of exclusively scheduling Check Airmen as LOE seat fillers is thus nothing less than an effort to impose new working conditions on its pilots. Yet it has claimed the right to do so unilaterally, without negotiating the matter with APA. This case is thus analogous to the circumstances the Eighth Circuit considered in *Brotherhood of Maintenance of Way Employees v. Chicago & North Western Transportation Co.*, 827 F.2d 330 (8th Cir. 1987). There, the court affirmed a *status quo* injunction to restrain a rail carrier from unilaterally revising its existing policy pertaining to alcohol and drug use. Although the contract was "completely silent on employee alcohol or drug use," the court reasoned that, "by virtue of the parties' longstanding and recognized custom and practice," the

15

former policy had "become an implied term in the agreement of the parties." *Id.* at 334. *See also, e.g.*, *Int'l Bhd. of Teamsters v. Chautauqua Airlines*, 186 F. Supp. 2d 901, 909-10 (S.D. Ind. 2001) (issuing *status quo* injunction to restrain an airline from unliterally reducing the workweek for certain of its employees from 40 to 32 hours per week on the basis of an implied contractual commitment, even though "[n]othing in the parties' collective bargaining agreement addresse[d the airline's] ability to reduce the scheduled workweeks for full-time employees"). The same is true here: the parties' deeply entrenched practice of exclusively scheduling Check Airmen as LOE seat fillers is an implied term of the CBA. Under the RLA, then, American may not change that practice unilaterally unless some arguable interpretation of the parties' CBA justifies that conduct. 45 U.S.C. § 152, Seventh.

**2.** In its motion, American seeks to justify its unilateral abandonment of the parties' decades-long practice by relying on the scope provisions of the CBA, which it claims "define the scope of work regulated by the JCBA." MTD 4; *see also* Am. App. 137 (Jewett Decl. ¶ 4). American observes that one of those scope provisions reserves "[a]ll flying performed by or on behalf of the Company or an Affiliate" to American's pilots in the bargaining unit, while another reserves to "Company pilots" the right to perform "flight training of Company pilots in Company aircraft." Am. App. 147 (Jewett Decl. Ex. A (CBA § 1(C)(1), (2))). Because American claims that seat filling in a flight simulator is not "flying" and does not occur "in Company aircraft," MTD 18, it concludes "that the work at issue falls outside of APA's agreed-upon scope of work," such that American is free "to use any line-qualified pilot, or, for that matter, any non-APA represented personnel, to seat-fill in the simulator" for LOE sessions, MTD 2.

That interpretation of the CBA is "obviously insubstantial," *Conrail*, 491 U.S. at 306, for multiple reasons.

*First.*  American does not claim that any provision of the parties CBA *permits* it to displace Check Airmen from their longstanding role as LOE seat fillers.  Instead, it claims a free hand to implement that change to working conditions unilaterally so long as no language in the CBA, such as the scope clause, *prohibits* it from doing so.  The law, however, is the exact opposite, as the Seventh Circuit recently held in rejecting the argument that "silence in the CBA . . . is enough to give the carrier carte blanche" to alter its employees' working conditions however it sees fit.  *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017). To the contrary, that court explained,

> [t]here is no ambiguity in the statute: any change to pay, rules or conditions must be authorized by contract or as the result of bargaining. . . . Contractual silence may give the carrier freedom to make changes to matters *not* affecting rates of pay, rules, or working conditions.  But contract and bargaining are the only options for subjects covered by section 152 Seventh.

*Id.* (internal citation omitted).

Indeed, if mere contractual silence permitted a carrier to justify its unilateral alteration of working conditions under a collective-bargaining agreement, then that "bold and novel proposition would eliminate the major dispute resolution procedures of the Act," which is reserved for "efforts to secure new rights *not now part of the agreement*."  *Bhd. of Locomotive Eng'rs v. Burlington N. R.R. Co.*, 838 F.2d 1102, 1106 (9th Cir. 1988) (internal quotation marks omitted) (emphasis added).  Where a party seeks to implement a new working condition on which the CBA is silent—that is, conditions that are "not a part of the express or implied terms of the existing collective bargaining agreements"—that effort, by definition, "presents a major dispute" seeking to obtain new contractual rights.  *Id.*

To the extent American seeks to draw inferences from the CBA's silences, it overlooks the most significant of those omissions—namely, the absence of any language permitting

17

American to implement working conditions that are not expressly prohibited.  Such provisions, usually referred to as "management rights clauses," are common in CBAs, and courts often rely on them in concluding that an employer has an arguable contractual basis to implement unilaterally a change in working conditions under the RLA.  *See, e.g.*, *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of American-Airline Division v. Sw. Airlines Co.*, 875 F.2d 1129, 1135 (5th Cir. 1989) (en banc).  American has not bargained to include such a clause in the parties' CBA.  APA App. 002 (Ferguson Decl. ¶ 7).  Having failed to do so, the default rule established by Section 2, Seventh, applies with full force: American must bargain with APA to change its employees' working conditions.

*Second.*  The implied terms of the CBA reinforce that conclusion.  To the extent American seeks to claim some sort of managerial prerogative to unilaterally displace Check Airmen as LOE seat fillers, "the existence of an implied agreement" pertaining to that working condition makes it "not a matter of managerial prerogative."  *Bhd. of Locomotive Eng'rs*, 838 F.2d at 1105; *accord Chi. & N. W. Transp.*, 827 F.2d at 334 (enforcing obligation implied by past practice and rejecting argument that contractual silence "commit[ted] the subject to [managerial] discretion"); *Bonnell/Tredegar*, 46 F.3d at 344 (same).  Indeed, "the major-minor dichotomy treats interpretation or application of express and implied contractual terms indistinguishably."  *Bhd. of Locomotive Eng'rs*, 879 F.3d at 758.

*Third.*  The CBA cannot possibly mean that all training activities that do not occur in Company aircraft "is not work within the scope of work covered by the JCBA," as American insists.  MTD 2 (emphasis omitted).  To the contrary, the CBA contains multiple provisions concerning training outside of "Company aircraft."  It includes, for example, provisions setting the rate of pay for "[a] pilot in a training program, including required ground school training,"

18

APA App. 042 (CBA § 6(B)(1)(a)), which specifically applies to "a pilot who receives a proficiency check in connection with . . . [a] simulator program," *id.* at 044 (CBA § 6(B)(5)(c)(2)).  It contains provisions governing the length of "[s]imulator training periods." *Id.* at 044 (CBA § 6(B)(6)(d)).  And it regulates when simulator training sessions can be scheduled. *Id.* at 078 (CBA Supp. Y ¶ H).

Indeed, the CBA has quite a bit to say about Check Airmen's work outside of American's aircraft.  The "actual time" for Check Airmen—which pertains to pay, *id.* at 040 (CBA § 3(C)(1)(a))—includes "[c]redit for non-flight standards work," which refers to functions "performed in a training facility," such as flight simulator training sessions, among other Check Airmen duties.  *Id.* at 056 (CBA § 12(B)(1)(b)(3), (f)).  The CBA governs the hours credited to a Check Airman for such non-flight standards work.  *Id.* at 056 (CBA § 12(B)(1)(b)(3)).  And it governs the maximum hours per day a Check Airman can be scheduled for that non-flight standards work.  *Id.* at 061 (CBA § 12(B)(5)(c)).  Indeed, the CBA recognizes a special job classification for an "X-Type Check Airman," who is qualified to perform certain functions on a simulator, *id.* at 056 (CBA § 12(B)(1)(m)), and is treated differently than other types of Check Airmen for multiple purposes, *see, e.g.*, *id.* at 057 (CBA § 12(B)(3)(b)), including a special seniority provision for the assignment of work at the Flight Academy, such as work on a flight simulator, *id.* at 059 (CBA § 12(B)(5)(a)(4)(c)).

By its express terms, then, the CBA governs work performed outside of American's aircraft, especially for Check Airmen, putting the lie to American's claim that any work outside the scope provisions is ungoverned by the CBA.[6]

---

[6]     In reality, the scope provisions in the CBA define what work shall be performed exclusively by APA-represented pilots, not the work as to which American has an obligation to bargain with APA.  *See* APA App. 019 (CBA Section 1(C)).

*Fourth.*  The CBA codifies a specific mechanism by which American may transfer, on a temporary basis, Check Airmen's work to other members of the bargaining unit—but American has entirely ignored that mechanism here.  Under Supplement O to that agreement, "[a] line pilot . . . may perform training or check functions" ordinarily assigned to Check Airmen so long as that pilot is properly trained "to perform Check Airman . . . functions"; those temporary assignments account for a less than a specified percentage of monthly Check Airmen work (pursuant to a contractually defined calculation); and those pilots are paid an additional wage premium, among other restrictions.  *Id.* at 074-75 (CBA Supp. O ¶¶ 1, 2, 7, 9).  But American has not attempted to rely on Supplement O to achieve its plan to use line pilots as LOE seat fillers.  It has not, for example, offered the requisite premium pay to line pilots who will serve as LOE seat fillers, as Supplement O requires.  *See id.* at 094-96 (Ferguson Decl. Ex. 6).

The parties' codification of a specific contractual mechanism by which American may temporarily assign Check Airmen's work to other members of the bargaining unit confirms that the assignment of that work *is* governed by the CBA.  Any other reading of the parties' agreement would make Supplement O a dead letter, notwithstanding the blackletter rule that contract should not be read in a way that "leaves a part . . . of no effect."  Restatement (Second) of Contracts § 203(a); *accord, e.g.*, *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 376 (5th Cir. 2002).  It follows that Check Airmen work may not, as American contends, be transferred however, and on whatever terms, American sees fit.

*Fifth.*  Unable to find purchase in the language of the CBA or the parties' past practice, American turns to the parties' negotiations for a letter of understanding dating from 1979, which it speculates was a precursor to the CBA's scope provisions.  MTD 20-21.  Because American rejected an APA proposal that simulator training would be performed by members of the

20

bargaining unit, at a time when Check Airmen work was not recognized as being covered by the parties' bargaining relationship, American asks this Court to ignore the subsequent four decades of the parties' relationship.  Since that time, however, the National Mediation Board recognized Check Airmen as members of the bargaining unit represented by the APA, *In re Application of the Allied Pilots Ass'n*, 19 NMB 113, 127 (1991), and the parties have since developed a practice, now ripened into an implied contractual commitment, of relying on Check Airmen as LOE seat fillers.  Their relationship has thus fundamentally changed since 1979, making negotiations from that year all but irrelevant.

*     *     *

In sum, American has no arguable contractual basis to unilaterally alter the working conditions of its pilots by replacing Check Airmen with line pilots as LOE seat fillers. American's efforts to do so thus give rise to a major dispute that must be resolved via the RLA's major dispute resolution processes, beginning with negotiations.  American's motion to dismiss should thus be denied.  And APA is likely to prevail on the merits of its claim that American's unilateral decision to rely on line pilots, rather than Check Airmen, to serve as LOE seat fillers must be enjoined unless American exhausts the RLA's major dispute resolution processes.

## II.    Issuance of an injunction does not turn on irreparable harm.

As noted *supra* at 8, an injunction to restore the *status quo* during the pendency of a major dispute under the RLA is not conditioned on "the customary showing of irreparable injury."  *Conrail*, 491 U.S. at 303.  *Accord, e.g.*, *BNSF*, 973 F.3d at 334; *S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 133-34 (D.C. Cir. 1964) (affirming preliminary injunction restoring the *status quo* under the RLA without evaluating irreparable injury); *Chautauqua Airlines*, 186 F. Supp. 2d at 911 (issuing preliminary injunction without evaluating irreparable injury).  There is thus no need for such a showing here.

21

**III.    The balance of equities favors an injunction to maintain the *status quo*.**

The balance of equities here tips sharply toward issuance of an injunction to enforce the requirements of the RLA.  As the Sixth Circuit has recognized, employers are "unlikely to suffer substantial harm from being required to preserve the status quo," in part because they are already "obliged by statute to do so."  *Flight Options, LLC v. Int'l Bhd. of Teamsters*, 863 F.3d 529, 545 (6th Cir. 2017).  The potential harm here from such an injunction is particularly minimal because American has operated for decades by relying on its Check Airman to serve as LOE seat fillers.  American will thus continue to be able to train pilots as it has always done.

The only harm American has asserted is that its effort to "expand [its] pilot-training capabilities to a historically unprecedented level," Am. App. 230 (Jewett Decl. Ex. T), would be hampered by being held to the parties' longstanding past practice of relying on Check Airmen as LOE seat fillers, Am. App. 22 (Hogg Decl. ¶ 37).  But the maintenance of the *status quo* would not slow American's training, but merely affect efforts to accelerate it.  And if that acceleration were as important as American claims, then American has still less justification for either ignoring the contractually recognized mechanism for assigning Check Airmen work to line pilots, which is codified in Supplement O of the CBA, or failing to complete negotiations for a new CBA with APA that would permit American to achieve its aims.  *See supra* at 19-20.

By contrast, the pilots APA represents will suffer from the uncertainty and potential unfairness of the untested evaluation system that American seeks to implement.  As noted *supra* at 4-5, serving as an LOE seat filler is specialized work, requiring the substitute to strike the right balance between giving the trainee too little feedback and too much feedback.  Many line pilots—lacking the experience of Check Airmen—may be unable to strike that balance appropriately after a single day of classroom training.  Using line pilots as LOE seat fillers thus threatens to deny trainees a fair and proper evaluation of their skills and put them at risk of

failing LOE sessions for reasons that are not their fault.  *See supra* at 3-4.

APA will also suffer if American is permitted to bypass the collective-bargaining process codified by the RLA and to implement new working conditions unilaterally.  Bypassing the collective-bargaining process undermines the union's status and risks diminishing it in the eyes of its members.  *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011).  It certainly undermines the negotiations in which the parties are currently engaged, reducing the trust necessary to reach the sort of amicable settlements that the RLA seeks to foster.  Indeed, the parties are actively negotiating a targeted agreement in which the working conditions of Check Airmen are among the limited number of subjects on the table.  *Supra* at 5-6.

## IV.     The public interest favors an injunction.

Every time an American plane takes to the skies, its passengers rely on the skills of their flight crew to bring them safely back to earth.  LOE sessions are one of the primary means by which the skills of those crew members are evaluated.  And, as noted *supra* at 4-5, Check Airmen have the experience necessary to ensure that those LOE sessions are not only fair to trainees, but also that they provide an accurate demonstration of the skills of those trainees.  Maximizing the likelihood of an accurate evaluation to measure those skills is thus squarely in the public interest.

Likewise, enforcement of the RLA's *status quo* requirement is in the public interest.  That requirement—which equally prohibits management and labor from engaging in economic self-help—is designed to minimize the likelihood of labor strife that might interrupt air travel.  *See, e.g.*, *Shore Line*, 396 U.S. at 155.  Accordingly, "the public's interest in uninterrupted service . . . . is protected by maintenance of the status quo."  *Flight Options*, 863 F.3d at 545.

## V.      APA has made all reasonable efforts to resolve its dispute with American.

The NLGA's clean hands provision applies to labor disputes, like this one, arising under

the RLA.  As a general matter, the NLGA "narrow[s] the courts' jurisdiction to enjoin labor disputes" in an effort to "stop courts from indiscriminately awarding injunctions against striking employees." *BNSF*, 973 F.3d at 337.  But the Supreme Court has long instructed the federal courts "[t]o accommodate" the NLGA to the RLA, explaining "that the Norris-LaGuardia Act does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Burlington N.*, 481 U.S. at 445 (quoting *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772 (1961)).

Under the NLGA's clean hands provision, parties seeking an injunction in a labor dispute must "make every reasonable effort to settle such dispute" before seeking judicial intervention. 29 U.S.C. § 108.  APA has satisfied that requirement here.  APA objected immediately upon learning that American sought to unilaterally alter Check Airmen's working conditions, *supra* at 6-7, and it asked American to negotiate with APA about that change that American sought to implement to its training program.  APA App. 007 (Ferguson Decl. ¶ 24).  American has nonetheless refused to negotiate *this* dispute, notwithstanding ongoing collective bargaining. There are no further reasonable efforts for APA to undertake.

## VI.    This Court should require APA to post little to no security.

Ordinarily, Federal Rule of Civil Procedure 65(c) conditions preliminary injunctive relief on the successful applicant's provision of "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See also* 29 U.S.C. § 107 (parallel provision under the NLGA).  Here, however, issuance of the requested injunction will cost American little to nothing.  American will continue to be able to train pilots and evaluate them in LOE sessions as it always has, using Check Airmen as LOE seat fillers, rather than line pilots.  No matter what, American will have to pay *some* pilot to seat fill during LOE sessions.  And line pilots are no cheaper than Check Airmen.  Indeed, American

24

credits Check Airmen with only one more minute of pay for flight simulator work than it has offered to line pilots who volunteer under American's new, unilaterally implemented program. *Compare* APA App. 060 (CBA § 12(B)(5)(b)(4)), *and id.* at 083 (Ferguson Decl. Ex. 2 at § B(3)) (crediting Check Airmen with 5:26 hours for non-flight standards work), *with id.* at 096 (Ferguson Decl. Ex. 6) (promising line pilots "an extra day of pay at 5:25 hours").

Where the grant of injunction carries "no risk of monetary loss to the defendant," this Court has discretion to "dispense with security altogether."  11A Wright & Miller, *Fed. Prac. & Proc.* § 2954 (3d ed.); *see also Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971); *Janvey v. Alguire*, 2010 WL 11619267, at *9 (N.D. Tex. June 10, 2010).  It should do so here—or, at the very least, require a minimal bond.

## CONCLUSION

For the reasons stated above, this Court should deny American's motion to dismiss and issue a preliminary injunction prohibiting American from abandoning the parties' established past practice of relying on Check Airmen as LOE seat fillers unless and until American complies with the mandatory dispute-resolution procedures applicable to "major" disputes under the RLA.


Date: April 25, 2022

/s/ Sanford R. Denison
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX  75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

Joshua B. Shiffrin*
D.C. Bar No. 501008
Joshua A. Segal*
D.C. Bar No. 1033731
BREDHOFF & KAISER, P.L.L.C.

25

805 Fifteenth St, N.W., Suite 1000
Washington, D.C. 20005
Tel.: (202) 842-2600
Fax.: (202) 842-1888
Email: jshiffrin@bredhoff.com
Email: jsegal@bredhoff.com

*Counsel for Plaintiff Allied Pilots Association*

*\*Admitted* Pro Hac Vice

**CERTIFICATE OF SERVICE**

I certify that on April 25, 2022, a true and correct copy of the foregoing document was served on counsel of record for all parties via the Court's ECF system.

                                                 _/s/ Sanford R. Denison_
                                              Sanford R. Denison