UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ALLIED PILOTS ASSOCIATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00315-O |
| | § | |
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant's Motion to Dismiss (ECF Nos. 9–10), filed April 20, 2022; Plaintiff's Response (ECF Nos. 16–17), filed April 25; Defendant's Reply (ECF No. 25), filed May 6; Plaintiff's Motion for Preliminary Injunction (ECF Nos. 14, 16–17), filed April 25; Defendant's Response (ECF Nos. 27–28), filed May 6; and Plaintiff's Reply (ECF No. 29), filed May 13. Having considered the motions, briefing, and applicable law, the Court **GRANTS** the motion to dismiss.

### I.   BACKGROUND

The Allied Pilots Association is the exclusive Union representing pilots employed by American Airlines, Inc.[1] For the past several decades, the Union and American have executed collective bargaining agreements that govern the pilots' employment terms.[2] The parties signed the current agreement at issue in this case in 2015.[3] American employs various types of pilots with differing responsibilities and qualifications. The Union challenges the extent to which American can unilaterally change certain pilot assignments.

---

[1] Pl.'s App. 6, ECF No. 17.
[2] *Id.*
[3] *Id.*

American employs "check pilots" and "line pilots." Check pilots are specially trained to evaluate and certify the knowledge and skills of line pilots.[4] Check pilots are Union members who also help monitor American's compliance with the collective bargaining agreement.[5] Section 1.C.2 of the agreement sets the scope of the terms, providing that "[a]ll flight training of Company pilots in Company aircraft shall be performed by Company pilots."[6] Noticeably absent is any mention of check pilots or simulator training.

American implements a three-phase pilot training program. The first phase is mostly classroom instruction.[7] The second phase is flight training, which consists of ten days in a flight simulator. The first nine days are primarily instructive, taught by a mixture of simulator pilot instructors and check pilots.[8] The tenth day is a "line operational evaluation" designed to assess the pilot's performance in line operations—that is, day-to-day passenger flights.[9] A check pilot who is specifically designated by the FAA to approve pilots for type ratings evaluates the student during day ten.[10] The third phase is "operating experience," which takes place in a passenger airplane rather than a simulator.[11]

Throughout all phases of the training program, American attempts to schedule all pilot training with "crew pairings."[12] Ideally, each student Captain will be paired with a student First Officer, and the two students will be accompanied by an instructor.[13] The goal is to simulate a

---

[4] *Id.* at 105.
[5] *Id.* at 104.
[6] *Id.* at 23.
[7] Def.'s App. 10–12, ECF No. 10.
[8] *Id.* at 12–16.
[9] *Id.* at 16–17.
[10] *Id.* at 16.
[11] *Id.* at 20.
[12] *Id.* at 13.
[13] Def.'s App. 13, ECF No. 10.

complete crew "occupying their normal duty positions."[14] When a pilot pair is unavailable or a student has been scheduled without a second pilot, American uses "seat-fillers" to preserve the simulation's realism.[15] During the first seven days of phase two, American does not require a seat-filler. That is, if American is unable to find a student pilot, simulator pilot instructor, or check pilot to fill the second seat, the solo student pilot may still complete the training accompanied only by the instructor.[16] Days eight, nine, and ten are different. During days eight and nine, if an appropriate *student* pilot is unavailable, American will assign a simulator pilot instructor to serve as a seat-filler.[17] If no simulator pilot instructor is available, American will assign a check pilot to serve as the seat-filler.[18] The seat-filler requirements for day ten, the evaluation day, are in dispute. For over twenty years, American has used only check pilots as seat-fillers for day ten.[19] Although the parties agree that this has been the historic practice, they disagree about whether American's documents *mandate* that only check pilots may serve as day-ten seat-fillers.[20]

American has detailed its seat-filling practices in the Instructor/Evaluator Administrative Guide. The guide contains a table listing seat-filler qualifications and priority.[21] The top-priority seat-fillers include "pilots who are either line qualified, or, if in training . . . are task familiar with the position in which they are substituting and line familiar."[22] The bottom-priority seat-fillers include instructors.[23] According to the Vice President of Flight Operations Training for American,

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at 14–15.
[17] *Id.* at 15–16.
[18] *Id.*
[19] Pl.'s App. 126–28, ECF No. 17.
[20] *See* Def.'s Mot. to Dismiss 13–14, ECF No. 9; Pl.'s Resp. 10, ECF No. 16.
[21] Pl.'s App. 114, ECF No. 17.
[22] *Id.*
[23] *Id.*

3

the table shows that seat-fillers for day ten need not be check pilots, and in fact "the use of a Check Pilot as the seat-filler is the least preferred approach."[24]

The next page of the guide contains more tables detailing approved seat-filler pairings for various training events. One table permits check pilots to serve as seat-fillers throughout phase two, including day ten.[25] The table permits simulator pilot instructors to serve as seat-fillers for every day *except* day ten. A check pilot for American submitted a declaration saying that this table shows that *only* check pilots may serve as seat fillers for day ten.[26] The overlap among line-qualified pilots, instructors, check pilots, and simulator pilot instructors is not entirely clear, but the tables seem to permit at least some non–check pilots to serve as seat-fillers.

In April 2022, American began allowing "fleet training pilots" to serve as seat-fillers.[27] The fleet training pilots are recent hires who are not check pilots and not members of the Union.[28] The Union objected, and American discontinued the practice.[29] A few days later, American announced that, beginning in May 2022, it would start permitting line-qualified First Officers and Captains to seat-fill on day ten.[30] Being a seat-filler is voluntary, but pilots may earn additional income on days off by volunteering to seat-fill.[31] Of the pilots who volunteer, American unilaterally selects seat-fillers without consultation with the Union and without regard to seniority.[32] The Union objected again, and filed this lawsuit.

---

[24] Def.'s App. 17, ECF No. 10.
[25] Pl.'s App. 115, ECF No. 17.
[26] *Id.* at 109.
[27] *Id.* at 8.
[28] *Id.*
[29] Def.'s App. 22, ECF No. 10.
[30] *Id.*
[31] *Id.* at 22–23.
[32] *Id.* at 4–5.

4

The Union argues that American has breached the Railway Labor Act ("RLA") by unilaterally changing employees' agreed-upon working conditions.[33] The Union moved for injunctive relief requiring American to reinstate its exclusive reliance on check pilots as seat-fillers for day ten of phase-two training.[34] American moved to dismiss the case, arguing that the dispute is subject to binding arbitration and thus the Court lacks jurisdiction over the case.[35] The Union then moved for a preliminary injunction.[36]

## II. LEGAL STANDARD

A party may challenge subject matter jurisdiction by filing a Rule 12(b)(1) motion. If the court determines that it lacks subject matter jurisdiction, it must dismiss the action. Fed. R. Civ. P. 12(h)(3). A court may find subject matter jurisdiction is lacking from "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). "In considering a challenge to subject matter jurisdiction, the district court is 'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case.'" *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citation omitted).

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (citation omitted).

---

[33] Compl. 7–8, ECF No. 1.
[34] *Id.* at 9.
[35] *See* Def.'s Mot. to Dismiss, ECF No. 9.
[36] *See* Pl.'s Mot. for Prelim. Inj., ECF No. 14.

### III. ANALYSIS

Congress passed the RLA nearly a century ago to encourage peaceful resolution of labor disputes affecting interstate commerce. "To effectuate peaceful dispute resolution, the RLA sets out a mandatory and 'virtually endless' process of 'negotiation, mediation, voluntary arbitration, and conciliation.'" *BNSF Ry. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 334 (5th Cir. 2020) (quoting *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987)). "Specifically, the RLA delineates two tracks of resolution, depending upon whether the dispute is 'major' or 'minor.'" *Id.*

A major dispute is one in which a party seeks new terms "affecting rates of pay, rules, or working conditions." 45 U.S.C. § 152 Seventh; *see also id.* § 156. "Therefore, in a major dispute the 'issue is not whether an existing agreement controls the controversy' or an 'assertion of rights claimed to have vested in the past.'" *BNSF*, 973 F.3d at 334 (quoting *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945)). Rather, major disputes "look to the acquisition of rights for the future." *Elgin*, 325 U.S. at 723. Resolution of major disputes requires a protracted scheme of conferences, negotiation, mediation, and arbitration. *BNSF*, 973 F.3d at 334. "Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n* (*Conrail*), 491 U.S. 299, 302–03 (1989). Courts may "enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." *Id.* at 303.

"Minor disputes, on the other hand, contemplate the existence of a collective agreement already concluded and relate either to the meaning or proper application of a particular provision." *BNSF*, 973 F.3d at 335 (cleaned up). "In other words, 'the claim is to rights accrued, not merely to have new ones created for the future.'" *Wright v. Union Pac. R.R.*, 990 F.3d 428, 435 (5th Cir.

6

2021) (quoting *Elgin*, 325 U.S. at 723). The process for resolving minor disputes is "more streamlined" than the process for resolving major disputes. *Id.* The parties must first "confer" over the minor dispute. 45 U.S.C. § 152 Sixth; *see also id.* § 153 First. If conference negotiations fail, the parties must submit the dispute to binding arbitration before an adjustment board. *BNSF*, 973 F.3d at 335. The board "has exclusive jurisdiction over minor disputes," and "[j]udicial review of the arbitral decision is limited." *Conrail*, 491 U.S. at 304. Courts thus generally lack authority to enjoin parties over minor disputes. *Cf. id.* at 337.

The role of the Court turns on whether American's actions create a major or minor dispute. "[A] proposed action creates a minor dispute 'if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.'" *BNSF*, 973 F.3d at 335 (quoting *Conrail*, 491 U.S. at 307). "A party faces a 'relatively light burden' to show that a dispute is minor." *Id.* (quoting *Conrail*, 491 U.S. at 307). "[I]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Id.* (citation and internal quotation marks omitted). "Accordingly, the proper inquiry is *not* who is right or wrong on the merits of the contract interpretation question," but, rather, whether American's asserted contractual position is arguably justified. *BNSF Ry. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, No. 4:22-cv-0052, 2022 WL 522551, at *3 (N.D. Tex. Feb. 22, 2022). "And if the dispute is capable of resolution by reference to the express or implied terms of the Parties' collective bargaining agreement (i.e., arguably justified), the actual resolution of the dispute is for the arbitrator—not this Court." *Id.* (citation and internal quotation marks omitted).

American's actions create a minor dispute under the RLA. The plain language of the collective bargaining agreement supports American's position. The agreement details what type

of work may be performed by only Union-represented pilots: (1) all "flying performed by or on behalf of the Company or an Affiliate," and (2) all "flight training of Company pilots in Company aircraft."[37] The agreement does not discuss seat-filling or other simulator training, nor does it discuss check pilots. The agreement's plain language thus "does not explicitly preclude" non–check pilots from serving as seat-fillers, "providing—at a minimum—a non-fictitious argument" that non–check pilots may seat-fill. *BNSF*, 973 F.3d at 335–36. The Union does not dispute that the agreement's plain language is silent on the issue. Rather, the Union argues that "[t]he parties' longstanding and undisputed past practice of relying" on check pilots as day-ten seat-fillers "is so deeply entrenched that it has become an implied term in the parties' CBA."[38]

The parties' past practice, however, also supports American's position. The Union acknowledges that "[h]istorically, a wide range of pilots have served as seat fillers for flight simulator *training* sessions."[39] The Union distinguishes training sessions from evaluation sessions, arguing that during day ten, the evaluation session, American has relied only on check pilots to seat-fill.[40] American responds that the Union improperly analyzes the practice "on a granular day-by-day level."[41] The proper level of analysis, according to American, is to look at the types of pilots American has permitted to seat-fill during the full ten days of phase two. "The type of past practice relied on need not be identical to the challenged practice to satisfy the carriers' burden of showing arguable contractual justification." *Bhd. Ry. Carmen of U.S. & Canada v. Mo. Pac. R.*, 944 F.2d 1422, 1429 (8th Cir. 1991) (citing *Conrail*, 491 U.S. at 311–19). The collective bargaining agreement does not discuss each individual day of phase two, lending support to

---

[37] Pl.'s App. 23, ECF No. 17.
[38] Pl.'s Resp. 17, ECF No. 16.
[39] Compl. 5, ECF No. 1.
[40] Pl.'s Resp. 19–21, ECF No. 16.
[41] Def.'s Mot. to Dismiss 27–28, ECF No. 9.

American's position that day-to-day comparisons are too granular. One could also reasonably argue that seat-filler responsibilities are similar enough among all ten days, so separating out day ten is an arbitrary distinction. The proper question would be, "Who has American allowed to serve as seat-fillers?" Not, "Who has American allowed to serve as seat-fillers *on day-ten*?" Again, American's position is at least arguably justified. *See BNSF*, 973 F.3d at 335.

The Union derives its day-to-day analysis from the Instructor/Evaluator Administrative Guide. But the guide also arguably supports American's position. The parties offer competing interpretations of the guide, both supported by declarations.[42] The administrative guide appears to favor American's interpretation, but both parties' interpretations are plausible.[43] At this stage, the Court need not determine "who is right or wrong on the merits of the contract interpretation question." *BNSF*, 2022 WL 522551, at *3. American's interpretation of the administrative guide is at least arguably justified. *See BNSF*, 973 F.3d at 33.

American has born its "relatively light burden" to show that its position is justified by the collective bargaining agreement. *Conrail*, 491 U.S. at 307. American raises several other arguments bolstering its position, but the Court need not address them. American has adequately shown that this case concerns a minor dispute under the RLA. The Union must seek relief in the RLA's negotiation procedures, not the courts.

### IV.     CONCLUSION

The Court **GRANTS** American's motion to dismiss (ECF No. 9), **DISMISSES** the Union's preliminary-injunction motion (ECF No. 14) as moot, and **DISMISSES** the case for lack of jurisdiction.

**SO ORDERED** on this **20th day** of **May, 2022.**

_____
Reed O'Connor
UNITED STATES DISTRICT JUDGE

---

[42] *See* Def.'s App. 17, ECF No. 10; Pl.'s App. 109, ECF No. 17.
[43] *See supra* Part I.